8 F.3d 1174
 62 USLW 2372, 8 IER Cases 1697, 9 IER
Cases 827
 Timothy McGANN, John Petrizzo and John Suchor, on behalf of
themselves and all others similarly situated,
Plaintiffs-Appellants,
v.
NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION
d/b/a Metra/Metropolitan Rail, a body politic and municipal
corporation, Fred Leonard, individually and in his official
capacity as Commander, Metra Police Force, Donald Carroll,
individually and in his official capacity as Captain, Metra
Police Force, et al., Defendants-Appellees.
 No. 92-1520.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 10, 1992.
Decided Nov. 3, 1993.
As Amended on Denial of Rehearing and Rehearing In Banc
May 4, 1994.
 
 J. Reed Millsaps, William D. O'Donaghue (argued), Chicago, IL, for plaintiffs-appellants.
 Frederick J. Sperling (argued), Charles H.R. Peters, Judith L. Marrs, Schiff, Hardin & Waite, Chicago, IL, Joann C. Pelka, Raymond M. Coyne, Metra, Chicago Regional Transp. Authority, Chicago, IL, for defendants-appellees.
 Before CUDAHY and ROVNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 CUDAHY, Circuit Judge.
 
 
 1
 On September 4, 1990, police officers of Northeast Illinois Regional Commuter Railroad Corporation d/b/a Metra-Metropolitan Rail (Metra) searched every vehicle leaving its 47th Street facility parking lot. Three of those individuals whose cars were searched brought this § 1983 class action suit against Metra and six Metra police officers alleging that they violated the plaintiffs' Fourth Amendment rights by subjecting the plaintiffs to an unlawful search and seizure. The district court granted summary judgment against the plaintiffs on the grounds that the plaintiffs were not forced to remain in the parking lot and that the plaintiffs consented to the search. Because we conclude that there are genuine issues of fact precluding summary judgment, we reverse and remand.
 
 I.
 
 2
 This class action pursuant to 42 U.S.C. § 1983 was brought by the named plaintiffs Tim McGann, John Petrizzo and John Suchor against Metra and six of its police officers[1] as a result of a warrantless search performed on September 4, 1990. For simplicity, we will refer to the defendants collectively as Metra. The named plaintiffs and all of the class members are employees of Metra's 47th Street facility who parked their cars in the facility parking lot on the day the search was conducted. The plaintiffs allege that Metra, acting under color of law, violated their Fourth Amendment rights by subjecting them to an illegal search and seizure.[2]
 
 
 3
 The parties agree that the facts of this dispute are to be gleaned from the depositions of Petrizzo, Suchor and McGann, and it was stipulated at the class certification hearing that the class would be bound by their testimony. Although both parties rely on these depositions, each party draws from them dramatically different factual conclusions. A careful review of the record indicates the following. The parking lot at Metra's 47th Street facility is enclosed by a fence and has two entrance gates. Prominently posted at each of these gates is a sign stating:
 
 
 4
 VEHICLES ENTERING OR EXITING METRA PROPERTY ARE SUBJECT TO
 
 
 5
 SEARCH BY METRA POLICE.
 
 
 6
 It is undisputed that the plaintiffs had read the signs and were aware of them upon entering the parking lot on September 4, 1990. It is also undisputed that Metra employees were not required to park in the lot. The plaintiffs could continue to work at the facility without parking there and could also take public transportation to work if necessary. Plaintiffs argue, however, that, due to the high rate of crime in the neighborhood surrounding the facility, parking in the lot was all but a "necessity" if an employee hoped to avoid the risk of property damage and personal attacks.
 
 
 7
 As the plaintiffs left work on September 4, 1990, they were stopped at the exits by Metra police officers. According to Petrizzo, he was stopped by Metra police, some of whom were wearing Metra police uniforms, just before reaching the exit gate. Petrizzo stated that "the guy that searched our car just asked us to get out," and that "we submitted to that." Petrizzo related that the officer "said he was going to search the car and to open the trunk." Petrizzo conceded that he never resisted the search and that he was never told that he must submit to it. When asked to open the trunk, he did so. He also conceded that nobody ever searched his person. Petrizzo testified, however, that he assumed he could not leave the parking lot, and that, if he had known he could have left the lot without being searched, he would have.
 
 
 8
 Suchor testified that when he punched out and attempted to leave the facility on the day in question, he was met by a line of approximately fifteen to twenty cars waiting to be searched. Suchor stated that after about 15-20 minutes, he arrived at the half-closed exit gate and was stopped by Metra police. A Metra police officer asked him, "Do you mind stepping out of your car." As he got out, Suchor testified that another officer, without asking permission, entered from the passenger side and proceeded to search his car. Suchor was asked whether he minded opening his trunk, to which he responded that he didn't mind, and opened the trunk for the officers. Suchor attested that he never refused the search, that he was not ordered to submit to the search and that he was never told that he could not leave. Nonetheless, Suchor did indicate that he believed he was not free to leave, stating, "When they stop in front of you, you're [n]ot going to run over a person."
 
 
 9
 McGann testified that as he approached the exit gate after work on the day in question, he faced a line of approximately ten cars waiting to be searched. At the gate was a Metra police car, two Metra police officers and Mr. Globis, his supervisor. McGann drove up along the side of the line and approached Globis to remind him of an earlier conversation in which McGann informed Globis that he would have to leave work right away in order to get home to watch his child. Globis responded, "As soon as I get done here, I'll send them over to your car." When asked whether he was essentially requesting Globis to move him to the front of the line, McGann responded affirmatively. Later in the deposition, however, McGann clarified that, "I don't know if I actually said the words, 'Can you do me, so I can get out of here.' I just said that, 'I have to get home.' " Pursuant to this discussion, Globis instructed the police officers to search McGann's car next. McGann was approached by a uniformed officer who asked him whether the vehicle was his. McGann told him that it was, and the officer opened the driver's side door and began looking under the seats, behind the seats and in "the little box in the middle." McGann testified that at this point he asked why he was being searched, to which the officer responded, "Just looking." The officer then asked McGann to open the back doors and the trunk, which McGann did. As the uniformed officer searched the trunk, another officer dressed in a shirt and tie told McGann to open the passenger side door, which McGann did. McGann testified that this officer then "ordered me to open the side door." The uniformed officer told the other officer, however, that he had already searched that area. McGann stated that after the search was completed, the uniformed officer took down his name and license number to record that he had been searched. McGann concedes that he did not object to the search, but believed that he did not have a choice. McGann maintains that Globis' comment that he would be next indicated to him that he could not leave until he was searched.
 
 
 10
 Metra moved for summary judgment arguing (1) that the plaintiffs consented to the search by entering the parking lot with knowledge of the posted signs authorizing the search of their vehicles, (2) that, separately and independently, the plaintiffs consented to the search by their explicit conduct at the time of the search and (3) that at no time did Metra restrict the plaintiffs' freedom of movement.
 
 
 11
 The district court granted summary judgment against the plaintiffs. Quoting testimony by each of the named plaintiffs to the effect that the gate was not locked and that the plaintiffs were not told they could not leave, the district court held that there was no evidence that the plaintiffs were forced to remain in the parking lot and submit to the search. The court then concluded that the plaintiffs voluntarily consented to the search of their vehicles by their conduct in cooperating in the search.[3]
 
 II.
 
 12
 Our review of a grant of summary judgment is de novo. The issue is simply whether the record and all inferences viewed in the light most favorable to the non-moving party reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The plaintiffs contend that the district court erred in granting summary judgment against them because there is a genuine issue whether the plaintiffs voluntarily consented to the warrantless search.
 
 
 13
 The touchstone of the Fourth Amendment is reasonableness. Florida v. Jimeno, 500 U.S. 248, ----, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). The Fourth Amendment proscribes only searches and seizures which are unreasonable. Id. Warrantless searches are per se unreasonable unless the search falls within one of "a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Confronted with a warrantless search, it is the burden of the government to prove that the search was reasonable under a particular exception. Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). One of these specific exceptions to the warrant requirement is the case of the warrantless search conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). In principle, it is reasonable for the police to conduct a search once they have been permitted to do so. Jimeno, 500 U.S. at ----, 111 S.Ct. at 1803. For a warrantless search premised on consent to be valid, the government must show that the consent was freely and voluntarily given--a factual question to be determined by the totality of the circumstances. Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2047.
 
 
 14
 Metra maintains that the plaintiffs consented to the search in two ways. First, Metra contends that the plaintiffs impliedly consented to having their cars searched by freely entering the parking lot knowing, by way of prominently posted signs, that doing so could subject their automobiles to a search. Second, Metra argues that the plaintiffs consented to the search when the plaintiffs voluntarily permitted the officers to conduct the search. We will address each of these arguments in turn.
 
 
 15
 Before proceeding with this analysis, however, we must discuss one major difficulty that confronts us at the outset. As we have noted, the standard against which we must measure the constitutionality of this search is the norm of reasonableness. Ordinarily, a determination of reasonableness involves such considerations as the justification for the search and the circumstances in which the search is performed. Here the plaintiffs in their brief indicate that this search of the Metra employees was undertaken in response to a burglary of the Metra facility occurring sometime over the weekend immediately preceding the search. But the record does not disclose that any such burglary took place, and the defendants have not justified the search on those grounds. Indeed, Metra is adamant in refusing to rely on the existence of any factual circumstance other than the plaintiffs' consent as a justification for the search. Although repeatedly pressed during oral argument to put the search into its factual context, the defendants refused to assert the purpose for it and instead chose to rely on consent alone.[4] While consent may be an "independent" ground to justify a search, other indicia of reasonableness have a bearing on our evaluation of the consent issue. The reason for this is simple: it may be presumed that a person would be less inclined to consent freely to a search having no justification than to one that was otherwise well-justified. Moreover, if the alleged consent is a general one or we are called upon to infer consent from conduct, the kind of search contemplated by the consent would presumably be one tied to a plausible purpose. Here we have the unusual circumstance of reviewing in a vacuum an allegedly consensual search. We foresee serious obstacles to concluding that there are no questions of fact presented by a "consent" search when such an important consideration under the totality of the circumstances test as the purpose of the search is not in the record.
 
 A. Implied Consent
 
 16
 The plaintiffs argue that the sign alone is not enough to imply consent, and thus, the defendants have failed to show that they are entitled to summary judgment on this ground. Metra counters by directing us to cases in which courts have held that a person impliedly consented to a search by voluntarily undertaking conduct which the person was aware could subject him to a search. Courts have found, for example, that persons presenting themselves at security checkpoints in order to board an airplane or enter a prison, knowing by way of a sign or other notice that doing so would subject the persons to search, have impliedly consented to the search performed. See, e.g., United States v. DeAngelo, 584 F.2d 46 (4th Cir.1978) (boarding airplane), cert. denied, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979); United States v. Sihler, 562 F.2d 349 (5th Cir.1977) (entering prison). Metra suggests that all that is required for a court to find implied consent is (1) knowledge of the sign giving notice of a potential search and (2) voluntary conduct subjecting the person to a search.
 
 
 17
 We disagree. Courts confronted with claims of implied consent have been reluctant to uphold a warrantless search based simply on actions taken in the light of a posted notice. This hesitancy stems from the importance of the right at stake and the elusiveness of consent. As the Supreme Court noted in Schneckloth, courts are charged with guarding jealously against tactics taken to obtain a person's consent, and to be especially wary of those which may appear least objectionable:
 
 
 18
 "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."
 
 
 19
 412 U.S. at 228-29, 93 S.Ct. 2041-43 (quoting Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886)). Although implying consent in such circumstances may at first blush seem innocuous enough, the conditioning of access on the surrender of one's Fourth Amendment rights raises the specter of an unconstitutional condition, United States v. Chicago, Milwaukee, St. Paul, & Pac. R.R. Co., 282 U.S. 311, 51 S.Ct. 159, 75 L.Ed. 359 (1931); Blackburn v. Snow, 771 F.2d 556, 568 (1st Cir.1985), and, at a minimum, entails subtle coercion tending to vitiate the voluntariness of the "consent." United States v. Albarado, 495 F.2d 799, 806-07 (2d Cir.1974); Gaioni v. Folmar, 460 F.Supp. 10, 14 (M.D.Ala.1978); cf. Serpas v. Schmidt, 827 F.2d 23, 30 (7th Cir.1987), cert. denied, 485 U.S. 904, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988) (implied consent vitiated when premised on unconstitutional regulations). Further, it is not clear from the fact that the person undertook the conduct subjecting him to a search that he necessarily consented to the search actually performed. As Judge Swygert of this court noted in United States v. Dichiarinte, "[a] consent search is reasonable only if kept within the bounds of the actual consent":
 
 
 20
 In our view, consent is a waiver of the right to demand that government agents obtain the authorization of a warrant to justify their search; and the need for a warrant is waived only to the extent granted by the defendant in his consent. A defendant's consent may limit the extent or scope of a warrantless search in the same way that the specifications of a warrant limit a search pursuant to that warrant. Both limit the officers' activity by stipulating the areas into which they may look. Both may limit a search to certain areas or even to certain specified items within an area. Thus if the government agents obtain consent or a warrant to search for a stolen television set, they must limit their activity to that which is necessary to search for such an item; they may not rummage through private documents and personal papers.
 
 
 21
 445 F.2d 126, 129-30 & n. 3 (7th Cir.1971) (citations omitted); see also United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir.1992). A sign's blanket statement that a person is "subject to search," however, does not readily inform the person of the grounds for the search, the extent of the search or the frequency or regularity of the searches. The person's conduct therefore does not clearly establish that the person consented to the particular search in question. This factor parallels our earlier observations about the difficulties of construing a consent in a factual vacuum.
 
 
 22
 The facts of this case demonstrate the difficulties in finding consent based simply on notice and conduct. The plaintiffs testified that they essentially had no choice but to park in the lot. According to the plaintiffs, the area around the facility was so unsafe that parking outside of the lot presented a significant risk to person and property. Moreover, the plaintiffs attested that they did not think that they were consenting to be searched at any time for any purpose. McGann stated that he did not believe that the sign gave Metra the legal right just to stop any car without reason. Petrizzo, as well, testified that he believed Metra would need "just cause" to conduct a search on the lot.
 
 
 23
 Because of the concerns inherent in inferring consent, courts have not accepted Metra's notion of implied consent characterized simply by notice and voluntary conduct. To be sure, notice and voluntary conduct are relevant in evaluating the legality of a warrantless search under the doctrine of implied consent. These two factors, however, have tended to be necessary but not sufficient conditions in finding the search lawful. See McMorris v. Alioto, 567 F.2d 897, 900-01 (9th Cir.1978) (Kennedy, J.) (courthouse search). Going beyond notice and voluntary conduct, courts have looked to additional factors to validate a warrantless search. Hence, there is a view that the doctrine of implied consent really "has little to do with 'consent' " as that term is generally understood, 1 William E. Ringel, Searches & Seizures, Arrests and Confessions § 9.7 (1979), but is in reality a separate exception to the warrant requirement comparable to the exception for regulatory searches undertaken for an administrative purpose. McMorris, 567 F.2d at 899-900; United States v. Davis, 482 F.2d 893, 908-10 (9th Cir.1973); 4 Wayne LaFave, Searches & Seizures: A Treatise on the Fourth Amendment § 10.6(b) (2d ed. 1987). Generally, in deciding whether to uphold a warrantless search on the basis of implied consent, courts consider whether (1) the person searched was on notice that undertaking certain conduct, like attempting to enter a building or board an airplane, would subject him to a search, (2) the person voluntarily engaged in the specified conduct, (3) the search was justified by a "vital interest", (4) the search was reasonably effective in securing the interests at stake, (5) the search was only as intrusive as necessary to further the interests justifying the search and (6) the search curtailed, to some extent, unbridled discretion in the searching officers. See, e.g., McMorris, 567 F.2d at 899-900; United States v. Skipwith, 482 F.2d 1272, 1275 (5th Cir.1973); Collier v. Miller, 414 F.Supp. 1357, 1362 (S.D.Tex.1976); 2 Ringel, supra at § 16.2(e). We decline to regard these six factors as dispositive criteria. Rather, these factors should be examined carefully in each case in evaluating the totality of the circumstances and in respecting the consideration that the courts not unnecessarily extend exceptions to the warrant requirement.
 
 
 24
 In endorsing this balancing approach, we merely summarize and clarify the reasoning of earlier decisions. For instance, in cases in which the search was not justified by an interest as vital as the need to search persons boarding an airplane, courts have consistently rejected the claim that a person impliedly consents to a search merely by undertaking conduct that he was aware could subject him to a search. Conditioning entrance to a rock concert or other entertainment event on subjecting oneself to a search for contraband, for example, has been distinguished from airport searches and other circumstances in which compelling need supports a finding of implied consent. See Gaioni, 460 F.Supp. at 13-14; Stroeber v. Commission Veteran's Auditorium, 453 F.Supp. 926 (S.D.Iowa 1977); Wheaton v. Hagan, 435 F.Supp. 1134 (M.D.N.C.1977); Collier, 414 F.Supp. at 1362; see generally Russell J. Davis, Annotation, Validity, Under Federal Constitution, of Search Conducted as Condition of Entering Public Building, 53 A.L.R. Fed. 888 (1981); Jay M. Zitter, Annotation, Searches and Seizures: Validity of Searches Conducted as Condition of Entering Public Premises--State Cases, 28 A.L.R.4th 1250 (1984).[5]
 
 
 25
 Similarly, when there is a compelling security concern justifying the warrantless search, if the intrusiveness of the search exceeds that required to serve the legitimate security concerns, courts have readily rejected arguments that the person impliedly consented to the search and have required the government to articulate a reasonable justification for the excessive intrusion into the person's privacy rights. Indicative of these cases are those in which courts have refused to find that a visitor or corrections officer impliedly consented to a strip search upon seeking access to a prison. Cochrane v. Quattrocchi, 949 F.2d 11, 14 (1st Cir.1991) (corrections officer), cert. denied, --- U.S. ----, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); Blackburn v. Snow, 771 F.2d at 563 (prison visitor); Thorne v. Jones, 765 F.2d 1270, 1276 (5th Cir.1985) (prison visitor), cert. denied, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 313 (1986); Security and Law Enforcement Employees, District Council 82, etc. v. Carey, 737 F.2d 187, 202 n. 23 (2d Cir.1984) (correction officers); cf. Hunter v. Auger, 672 F.2d 668, 672 n. 8 (8th Cir.1982) (requiring reasonable suspicion to search prison visitors even though visitors informed that they are subject to "routine searches of their persons and property").
 
 
 26
 A number of courts also have noted the importance of curtailing undue discretion in the searching officers. See, e.g., McDonell v. Hunter, 809 F.2d 1302, 1309 (8th Cir.1987) (noting that vehicle searches within confines of prison may be conducted without reasonable suspicion of the vehicle searched only if done uniformly or by systematically random selection). For when the decision to search is left entirely to the discretion of the officers, the searches may stigmatize or embarrass the isolated individuals searched, tending to make the search relatively more intrusive. See United States v. Edwards, 498 F.2d 496 (2d Cir.1974); Wheaton, 435 F.Supp. at 1145-46.
 
 
 27
 Before evaluating the search using a balancing approach we have discussed, we must first address the threshold question whether the plaintiffs have maintained a reasonable expectation of privacy triggering Fourth Amendment protection. For if the plaintiffs do not have an expectation of privacy that "society is prepared to recognize as 'reasonable,' " Katz, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring), the interest is not afforded protection under the Fourth Amendment. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2579, 61 L.Ed.2d 220 (1979). Although it is well-established that citizens have a reasonable, albeit diminished, expectation of privacy in their automobiles, United States v. Martinez-Fuerte, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); South Dakota v. Opperman, 428 U.S. 364, 367, 96 S.Ct. 3092, 3095, 49 L.Ed.2d 1000 (1976), one may argue that any expectation of privacy is not reasonable once a person has subjected the automobile to search. The protections associated with the Fourth Amendment, however, are tied to objective reasonableness and merely lowering one's subjective expectations does not cause the constitutional protections to disappear. Serpas, 827 F.2d at 28 (pervasive regulation of industry does not render expectations of privacy unreasonable) (quoting Bionic Auto Parts and Sales, Inc. v. Fahner, 721 F.2d 1072, 1079 (7th Cir.1983)); see also Davis, 482 F.2d at 905 ("The government could not avoid the restrictions of the Fourth Amendment by notifying the public that all telephone lines would be tapped, or that all homes would be searched.").
 
 
 28
 We certainly believe, however, that the sign is relevant. At least when there are plausible alternatives to subjecting oneself to a search, a reasonable person who freely assumes the risk of a search would obviously not maintain the same expectations of privacy as one who chose to avoid the risk. The expectations of privacy of the person risking the search would be diminished. How much privacy a reasonable person would expect in the circumstances, of course, is not crucial to the threshold question whether a reasonable expectation of privacy exists to trigger Fourth Amendment protection, but it is a pivotal consideration when assessing the intrusiveness of the search at issue.
 
 
 29
 In the present context, we believe that a reasonable person parking in the Metra lot would have modestly, but not drastically, diminished expectations of privacy. Prior to the search in question, the prospect of actually having one's car searched by parking in the lot was slim. Unlike other situations involving signs to obtain consent, the persons were not immediately or uniformly searched upon undertaking the conduct subjecting them to a search, i.e., entering the lot. Indeed, until the search in question, no search had ever been conducted at the 47th street facility.[6] Because the plaintiffs were not on notice that they would in fact be searched, but only that there was a vague possibility that they might be searched, their expectation of privacy was only modestly diminished by the sign. Put another way, threats of searches, like cries of "Wolf", are hard to take seriously when the threats go unrealized.
 
 
 30
 With these principles in mind, we will attempt to evaluate the search by considering and balancing the factors we have cited as bearing on the implied consent exception. The first two factors are present since it is conceded that the plaintiffs were aware of the signs and voluntarily entered the lot. The third factor involves the interests served by the search. At the outset we recognize that the parking lot at issue here is not burdened with unique security concerns in the same sense as airports, prisons and courthouses, where courts have found special circumstances in implying consent. Indeed, the search at issue here is markedly different from the searches upheld in those contexts. In the case of airports, prisons and courthouses, the searches are performed routinely and indiscriminately on persons as they enter the restricted area. This practice of searching every person circumscribes the discretion of the searching officers. Moreover, conducting the search as people enter the restricted area furthers the purpose of preventing guns, explosives and other dangerous weapons from entering the plane or building.
 
 
 31
 On the other hand, the search here was, at least as far as the record discloses, random. There was no consistent practice of conducting searches. As noted, the search at issue was the first search performed at the 47th Street facility. Further, the search was not conducted upon entering the facility, nor even upon entering the parking lot. Rather, it was conducted as the vehicles left the lot. Obviously, the type of security concerns that justify airport, courthouse and prison searches is not present here.
 
 
 32
 To be sure, searches taken to further security concerns like those present in airports, courthouses and prisons are not the only ones that fall within the implied consent exception. Other interests might well support a search, so long as, among other things, the intrusiveness of the search corresponds to the relative significance of the interest at stake. As we indicated before undertaking our analysis, however, Metra has refused to proffer any reason for the search--even when repeatedly invited to do so. By failing to articulate the purpose of the search, Metra has not shown that the search clearly fits within the implied consent exception to the warrant requirement and that it is therefore entitled to judgment as a matter of law. The issue is therefore a matter for trial.
 
 B. Consent During the Search
 
 33
 Metra also argues that the plaintiffs consented to the search when the plaintiffs freely cooperated with the search after being politely asked if they would mind getting out of their vehicles and whether they would mind opening the doors and trunks. Metra emphasizes that the plaintiffs were never told that they must be searched or admonished that they were not free to leave, and insists that none of the plaintiffs objected to the search or otherwise indicated that they felt compelled to undergo the search.
 
 
 34
 The plaintiffs do not contest that they cooperated with the Metra officers in conducting the search. They argue, however, that the cooperation was the product of an unlawful seizure, and thus invalid to support consent. According to the plaintiffs, they were unlawfully seized when their vehicles were detained attempting to leave the parking lot.
 
 
 35
 The plaintiffs are correct that their purported consent is vitiated if it was the product of an unlawful seizure. Consent obtained after an illegal seizure is invalid unless it can be shown that the consent was in fact "sufficiently an act of free will to purge the primary taint" of the unlawful seizure. Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); United States v. Recalde, 761 F.2d 1448, 1457-58 (10th Cir.1985). The purported consent is free of the unlawful taint if there is a break in the causal connection between the illegality and the consent given. Recalde, 761 F.2d at 1458 (citing Dunaway v. New York, 442 U.S. 200, 217-18, 99 S.Ct. 2248, 2259-60, 60 L.Ed.2d 824 (1979)). When statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent. See Florida v. Bostick, --- U.S. ----, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); Florida v. Royer, 460 U.S. 491, 507-08, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983); United States v. McCraw, 920 F.2d 224, 230 (4th Cir.1990).
 
 
 36
 The record here does not indicate that, if there was an unlawful seizure, the plaintiffs' conduct was "sufficiently an act of free will to purge the primary taint" of the unlawfulness. Indeed, the plaintiffs' conduct which Metra relies upon to establish consent appears to have occurred contemporaneously with the alleged seizure.
 
 
 37
 We thus turn to whether there was an unlawful seizure. The determination whether an encounter between the police and a citizen is a seizure is, like the issue of consent, a highly factual one. United States v. Teslim, 869 F.2d 316, 321 (7th Cir.1989). Therefore, we can affirm the grant of summary judgment only if the record establishes, as a matter of law, that the plaintiffs were not unlawfully seized.[7]
 
 
 38
 1. Were the Plaintiffs Seized?
 
 
 39
 It goes without saying that not all encounters between the police and citizens implicate the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). As is true of searches, the legality of a seizure is a question of reasonableness. Essentially, there are three different categories of police-citizen encounters, each entailing its own standard for assessing whether the encounter was objectively reasonable. In United States v. Johnson, we delineated the categories as follows:
 
 
 40
 The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe that a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through noncoercive questioning. This is not a seizure within the meaning of the Fourth Amendment.
 
 
 41
 910 F.2d 1506, 1508 (7th Cir.1990) (citations omitted), cert. denied, 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). Metra maintains that the encounter between the police and the plaintiffs did not amount to a seizure but was limited to asking for consent to undergo the search. Because the plaintiffs do not contend that the encounter with the Metra police was an arrest, the issue is whether the situation amounted to an investigatory stop (which Metra would have to justify to sustain its lawfulness) or whether it amounted to simple questioning (which Metra was free to undertake without suspicion or cause).
 
 
 42
 A person is seized if, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " Bostick, --- U.S. at ----, 111 S.Ct. at 2387 (quoting Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)). Factors relevant to this determination, include, but are not limited to, the following: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554-55, 100 S.Ct. 1870, 1876-77, 64 L.Ed.2d 497 (1980) (Opinion of Stewart, J.).
 
 
 43
 In response to Metra's contention that the plaintiffs were not restricted and could have left the lot if they so chose, the district court held that there was no evidence that the plaintiffs were seized because the plaintiffs testified that the gate was not locked and that they were never told that they could not leave. We believe, however, that the record contains sufficient evidence to present a genuine issue whether the plaintiffs were seized prior to cooperating with the search. Initially, we note the similarities of the stop before us to a checkpoint or roadblock stop, in which nearly every vehicle crossing a particular point in the road is stopped by police for questioning and/or visual inspection. The Supreme Court indicated in Michigan Department of State Police v. Sitz, 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990), that a " 'seizure' occurs when a vehicle is stopped at a checkpoint." See also Martinez-Fuerte, 428 U.S. at 546 n. 1, 96 S.Ct. at 3077 n. 1 (whether the vehicles are stopped or allowed to "roll" through the checkpoint held irrelevant because "all motorists passing through the checkpoint are so slowed as to have been 'seized' "). We also note that in cases involving vehicle stops, courts have not distinguished between a seizure of the person and a seizure of the vehicle, but have presumed that the seizure of the vehicle, in effect, seized the person because a reasonable person would not have felt free to leave without the vehicle. See id.; United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) ("The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here."); United States v. Pavelski, 789 F.2d 485, 488-89 (7th Cir.) (reasonable person would not have felt free to leave when it was doubtful that "appellants could have maneuvered their car out of the parking lot" when it was bounded on three sides by patrol cars), cert. denied, 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986); cf. Royer, 460 U.S. at 501, 103 S.Ct. at 1325 (person seized when, among other things, the state retained airline ticket and driver's license). Although there may be subtle distinctions between this stop and a checkpoint stop, such as the degree to which one may feel restrained to leave, the similarity between them strongly suggests that the current encounter was a seizure.
 
 
 44
 The location of the search, the police conduct during the search and the subjective beliefs of the named plaintiffs as to their ability to escape the search, moreover, buttress the conclusion that there is a factual dispute whether the plaintiffs were seized. First, the location and surroundings of the search were rather restrictive. The parking lot in which the search took place is surrounded by a fence. The plaintiffs also testified that the exit gates were half-closed and that the Metra officers stood in front of the vehicles' path to stop cars as they approached the gate.
 
 
 45
 As to the conduct of the officers, the record establishes that there were several officers at the scene, some of whom were in uniform. The record also indicates that the officers asked the plaintiffs, "Do you mind stepping out of your car," or as Petrizzo put it, "the guy that searched our car just asked us to get out." Petrizzo also testified that an officer "said he was going to search the car and open the trunk," while Suchor testified that after he was asked to leave his car, another officer immediately entered the passenger side and proceeded to search the vehicle. McGann testified that, after he reminded his supervisor that he had to leave early, the supervisor responded by moving him to the front of the line. And when McGann asked an officer why he was being searched, the officer replied that they were "Just looking." These statements and actions by the Metra police could suggest to a reasonable person that the officers were not engaging in an effort to obtain consent, but rather were stopping the plaintiffs to conduct a search which the plaintiffs were not free to refuse. It may have been a polite seizure, but it had many earmarks of a seizure nonetheless. Moreover, even if the police statements were to be viewed as mere requests to search the plaintiffs' vehicles, the cold record does not indicate the tone of the requests, which, given the language of the statements, may indicate to the trier of fact that compliance was compelled. Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1876.
 
 
 46
 Finally, the record indicates that the named plaintiffs may not have felt free to forgo the search and leave the parking lot. Although the subjective beliefs of the persons allegedly seized are not dispositive of the issue whether a reasonable person in the circumstances would have felt free to leave, they are nonetheless relevant. E.g. United States v. Withers, 972 F.2d 837, 842 (7th Cir.1992). The plaintiffs were not informed that they were free to leave and forgo the search. Petrizzo testified that if he had known he could have left without being searched, he would have done so. Suchor stated that the officers "wouldn't let you leave," because "[w]hen they stop in front of you, you're [n]ot going to run over a person." And McGann testified that he interpreted his supervisor's statement that "he would be next" to mean that he could not leave until his car was searched. Given this record, we conclude that there is a genuine issue of fact whether the plaintiffs were seized.
 
 
 47
 2. Was the "Seizure" Unlawful?
 
 
 48
 The fact that the plaintiffs may have been seized of course does not necessarily mean that the plaintiffs' subsequent consent was invalid. Only if the seizure was unlawful would it work to taint the subsequent consent and, separately and independently, support the plaintiffs' claim that they were illegally seized in violation of the Fourth Amendment. For an investigatory stop to be a lawful seizure, the government must have specific and articulable facts sufficient to raise a reasonable suspicion that an individual committed or is committing a crime. Terry, 392 U.S. at 21, 88 S.Ct. at 1879; Teslim, 869 F.2d at 322. If the seizure is deemed a checkpoint or roadblock stop, on the other hand, the government is not required to have an individualized suspicion with respect to each person searched, so long as the need for the stop was great, the intrusion--measured by the duration of the search and the intensity of the investigation--was minimal and the discretion of the official was relatively circumscribed. Sitz, 496 U.S. at 451-54, 110 S.Ct. at 2485-87; Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 2640-41, 61 L.Ed.2d 357 (1979); Martinez-Fuerte, 428 U.S. at 556-59, 96 S.Ct. at 3082-83; see generally 3 LaFave, supra at § 9.5.
 
 
 49
 As we indicated earlier, however, Metra has disavowed any reliance on the objective reasonableness of its conduct absent consent.[8] Relying entirely on the plaintiffs' alleged consent and upon the argument that the police encounter was limited to asking for consent to search, Metra has failed to articulate the purpose of its actions. Consequently, because there is a genuine issue of fact whether the plaintiffs were unlawfully seized, Metra has not shown as a matter of law that the plaintiffs, by cooperating with the searching officers, consented to the search. Summary judgment on the plaintiffs' illegal search and seizure claims was therefore inappropriate.
 
 III.
 
 50
 We end our discussion where we began: The touchstone of the Fourth Amendment is reasonableness. Although we do not hold that Metra's conduct was unreasonable and, thus, unlawful under the Fourth Amendment, neither can we hold that Metra has met its burden of showing, as a matter of law, that its actions were objectively reasonable. Whether its actions were reasonable depends upon, among other things, the interests served by Metra's conduct. Absent a showing that the search served some purpose justifying the intrusion into the plaintiffs' privacy, Metra was not entitled to summary judgment. For these reasons, we reverse and remand for further proceedings consistent with this opinion.
 
 
 51
 REVERSED AND REMANDED.
 
 
 
 [1]
 Metra Police Commander Fred Leonard, Metra Police Captain Donald Carroll, and Officers Thomas Donegan, Douglas Linde, Thomas Ross and Kenneth Salman
 
 
 [2]
 The plaintiffs also alleged a pendent state law claim for false imprisonment
 
 
 [3]
 Metra argued before the district court and continues to argue before this court that the plaintiffs ignored their obligations under Local Rule 12(n) of the Northern District of Illinois. Rule 12(n) requires a party opposing summary judgment to respond to "each numbered paragraph in the moving party's statement" and, in the case of disagreement, to provide specific references to the record that support the non-moving party's factual disagreement. The plaintiffs, however, did not respond separately to each of Metra's numbered paragraphs but instead accepted as true only those paragraphs dealing with the identification of the parties and the basis for jurisdiction, denying all of Metra's other factual assertions. The plaintiffs then provided their own "Statement of Dispositive Facts," referencing the record and other submissions as appropriate. It is true that the party opposing summary judgment may be required to adhere strictly to the requirements of Rule 12(n), with any facts asserted by the movant not contradicted in the manner specified by the rule to be deemed admitted. Valenti v. Qualex, Inc., 970 F.2d 363, 369 (7th Cir.1992); Skagen v. Sears, Roebuck & Co., 910 F.2d 1498, 1500 (7th Cir.1990). The district court, however, has some discretion in determining whether the non-movant's response complied with Rule 12(n). Bell, Boyd & Lloyd v. Tapy, 896 F.2d 1101, 1103 (7th Cir.1990). Consequently, because the district court refused to hold the plaintiffs in noncompliance with Rule 12(n) and because the failure to respond separately to each numbered paragraph does not materially hamper our review of the motion, we do not think it appropriate to reject the plaintiffs' Rule 12(n) responsive statement. We will, however, limit our review of the supporting materials appended to the plaintiffs' responsive statement to those which have been properly authenticated. Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir.1980); Macklin v. Butler, 553 F.2d 525, 528 (7th Cir.1977)
 
 
 [4]
 The discussion at argument was as follows:
 THE COURT: I realize you're arguing consent, but let's just mention reasonableness, here, because we've had some ...
 METRA: I'll put it to rest, your honor, we do not rest ...
 THE COURT: What was the purpose of the search? If the record tells us.
 METRA: I could answer your question but it is not in the record. We do not argue that apart from consent there was a basis to inspect. And I'll be very candid with this court. Our position, your honor, is that they consented by engaging knowingly in the conduct that the sign told them could result in a search of the vehicle--not of the person. And that separately and independently they consented when they were reasonably asked. We do not argue, your honor, that apart from that, there would have been a basis to go ahead and search....
 We later returned to this point.
 THE COURT: I know you want to keep the focus on consent, but I want to ask a question about reasonableness. Is it your position that this burglary over the weekend was irrelevant to the conduct?
 METRA: Your honor, I wish I could address the basis for that [but] there is nothing in the record about a burglary over the weekend....
 Your honor, to respond to the question you were asking, we do rest our case on consent, and absent consent it would not have been permissible to inspect the vehicles. That's why we posted the signs.
 
 
 [5]
 In Jeffers v. Heavrin, 701 F.Supp. 1316, 1322 (W.D.Ky.1988), the district court held that a warrantless search of a patron entering Churchill Downs to attend the Kentucky Derby was not unlawful because the patron, given his choice to attend the Derby and knowing from past experience that he would be searched upon seeking admission, consented to the search. On appeal, the Sixth Circuit reversed on other grounds. It agreed that the patron consented to the search, but specifically refused to rely entirely on the doctrine of implied consent. The court noted that there are "dangers inherent" in using the "entry policy of a private entity to generate 'consent' and thus justify a search that otherwise would be beyond the power of the police agency to conduct." Jeffers v. Heavrin, 932 F.2d 1160, 1163 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 937, 117 L.Ed.2d 108 (1992)
 
 
 [6]
 The record does make brief reference to a search conducted at Metra's Blue Island facility, of which McGann was aware. According to McGann's testimony, an open can of beer was discovered in an employee's car by somebody walking by. Metra police were contacted and the owner of the vehicle was pulled from his job, had his vehicle searched and was suspended from 60 to 90 days
 
 
 [7]
 Of course, if there is a genuine issue of material fact whether the plaintiffs were unlawfully seized, summary judgment on the plaintiffs' unlawful seizure claim was also inappropriate
 
 
 [8]
 Supra note 4 and accompanying text