Kurtis L. KING, Plaintiff,

v.

Matthew FRANK in his official capacity; Gary R. McCaughtry, in his official and individual capacities; Curtis Janssen, in his official and individual capacities; Steven Schueler, in his official and individual capacities; Kevin Fritz; Todd Russell; Matt Robinson; Clint Schlieve; and Jennifer Opperman, Defendants.

No. 04–C–338–C.

United States District Court, W.D. Wisconsin.

May 26, 2005.

978

Kurtis L. King, pro se.

Charles D. Hoornstra, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this prisoner civil rights action under 42 U.S.C. § 1983, plaintiff Kurtis King alleges that defendants, officials within the Wisconsin correctional system, violated his constitutional rights by (1) restricting his telephone usage; (2) denying him access to written publications; (3) denying him contact visits with family and friends; (4) keeping his cell illuminated 24 hours a day; (5) failing to provide him with adequate mental health care; (6) denying him prescribed medication; and (7) failing to intervene while he suffered symptoms as a result of not receiving his prescribed medication. Subject matter jurisdiction is present. 28 U.S.C. § 1331.

At the time of the relevant events in this case, plaintiff was confined at the Waupun Correctional Institution in Waupun, Wisconsin. On February 14, 2005, plaintiff was transferred to the Wisconsin Resource Center in Winnebago, Wisconsin. (As noted in an earlier order, plaintiff's transfer moots his claims for injunctive and declaratory relief and leaves only his request for money damages.)

On February 18, 2005, defendants filed a motion for summary judgment as to all claims in this case. According to the schedule for briefing dispositive motions set out in the magistrate judge's preliminary pretrial conference order dated September 28, 2004, plaintiff had 30 calendar days, or until March 21, 2005, in which to oppose the motion. On March 25, 2005, plaintiff filed a document titled "Plaintiff's Affidavit Why Defendants' Motion for Summary Judgment Should not be Granted or Should at Least be Postponed." In an order dated March 29, 2005, I granted plaintiff a brief extension of time to respond to defendants' motion in light of his transfer from Waupun to the Wisconsin Resource Center. As a result of the extension, plaintiff had until April 4, 2005 in which to oppose defendants' motion. Plaintiff did not oppose the motion by this deadline and has not filed any documents with the court since March 25. If plaintiff believes that his March 25 filing was a proper response to defendants' motion, he is unfortunately mistaken. This court's summary judgment procedure and a memorandum for pro se litigants, both of which were sent to plaintiff, provide instructions regarding how to properly respond to a motion for summary judgment and state clearly that if a party fails to respond to a motion for summary judgment, the court will accept the opposing party's proposed facts as undisputed.

Presently before the court is defendants' unopposed motion for summary judgment.

I will treat all of defendants' proposed findings of fact as undisputed. Defendants have introduced facts showing that they are entitled to judgment as a matter of law on each of plaintiff's claims. Their motion will be granted in its entirety.

I find from the facts proposed by defendants and unopposed by plaintiff that the following facts are material and undisputed.

## UNDISPUTED FACTS

On May 20, 2003, plaintiff Kurtis King was transferred from the Wisconsin Secure Program Facility to the Waupun Correctional Institution. At Waupun, plaintiff was placed in the health and segregation complex. Because plaintiff was in program segregation when he left the Wisconsin Secure Program Facility, he was placed in the same status at Waupun from May 21, 2003 until October 17, 2003. On October 17, plaintiff was released from program segregation and placed in temporary lock-up. From November 19, 2003 until his transfer to the Wisconsin Resource Center on February 14, 2005, plaintiff was housed in administrative confinement status.

### A. Privileges in the Health and Segregation Complex

In program segregation status, an inmate progresses through a series of steps designed to encourage positive adjustment and provide an opportunity for the inmate to return to the institution's general population. The goal of the step series is to promote acceptable behavior by providing a controlled increase in privileges and responsibilities. The series itself is a process that provides inmates a chance to attain "Step Levels" and ultimate placement in the general population. When an inmate is transferred to the health and segregation complex at Waupun, he is giv-

en a handbook containing basic information, procedures and rules.

From May 20–29, 2003, plaintiff was on entry step status. He progressed to step 1 on May 29 and remained in that status until reaching step 2 on July 24, 2003. Plaintiff remained in step 2 until reaching step 3 on September 19, 2003.

## 1. *Publications*

Inmates in segregation are not allowed to possess publications such as magazines or newspapers because they misuse them in a number of ways. In the past, inmates have used them to plug toilets, which causes water to flow out of an inmate's cell and onto the range, requiring temporary movement of the inmate and any other inmate who may have water in his cell as a result of the plugged toilet to other cells that are dry. The property of the inmates whose cells are flooding may be damaged. Also, inmates may use pages from newspapers and magazines to cover the windows on their cell doors, preventing staff from seeing whether they are harming themselves or attempting suicide. In addition, inmates have used magazines and newspapers to make papier-mâché weapons. Institution staff have retrieved several papier-mâché weapons that would inflict severe injuries if used on staff or other inmates.

Inmates in segregation may receive free library books, which are made available every Saturday. Inmates in steps 1, 2 and 3, as well as those in protective confinement, temporary confinement and administrative confinement may receive two books at a time. In addition to the library books, inmates in temporary lock-up, program segregation and administrative confinement may have an address book, pocket dictionary, Bible, Koran or equivalent religious book.

## 2. *Telephone usage*

The segregation handbook provides that inmates in temporary lock-up, administrative confinement, protective confinement, and steps 2 and 3 of program segregation may make phone calls. Inmates in temporary lock-up and administrative confinement are allowed one ten-minute phone call each week. Inmates in step 3 are allowed two ten-minute phone calls each month and inmates in step 2 are allowed one ten-minute phone call each month. Only inmates whose status is pending, entry step or step 1 are not allowed to use the phone. Except for the time plaintiff spent in entry step and step 1 status, he was allowed regular phone calls during his time at the institution.

## 3. *Visitation*

Before December 2002, there were nine no-contact booths located in the health and segregation complex for inmates to use. The inmate was placed on one side of the booth and the visitor was placed on the other side. They communicated through a voice box built into the booth. In December 2002, the institution opened a new visiting center for security reasons. The visiting center is located at the front of the institution; this eliminates the need for visitors to be escorted through the prison, where they would be trapped in the event of a takeover or lockdown of the institution.

Visitors to the institution are escorted to the new visiting center where they are placed in front of a camera. The inmate is escorted to one of five visiting booths in the health and segregation complex that have been converted to televising booths and is placed in front of a camera. Both parties have monitors in their visiting areas to see each other and they can hear each other through an audio feed in the cameras. The other four no-contact

booths have not been converted to accommodate televised visits. Staff use these booths when it is necessary to interview an inmate in segregation in a secure location.

The segregation handbook states that inmates in program segregation are allowed one one-hour visit each week. Inmates in temporary lock-up are allowed one one-hour visit each week day and one one-hour visit each weekend. Inmates in administrative confinement are allowed one one-hour visit each week. Plaintiff had a total of 41 visits from his pastor, friends and family from May 21, 2003 until June 1, 2004.

Modern technology does not always function properly and electronic equipment fails occasionally. Staff are not aware of problems with the televising equipment until notified by an inmate. When they are notified of a problem, they try to repair the equipment as quickly as possible. If the video equipment functions poorly during a visit, the inmate is either moved to another booth, given another visit at another time or allowed more time on his next visit with the visitor. The poor quality visit does not count against the inmate's total number of allowable visits. From May 20, 2003 to June 2, 2004, various components of the video equipment in certain booths failed to work properly on five occasions.

### B. Cell Illumination

Staff at Waupun check on inmates several times each night for security reasons and for the welfare of the inmates. Staff must make certain that the inmates are in their cells and that they are not making weapons, attempting to escape, engaged in any suicidal or other harmful activities, damaging their cells or in need of emergency medical or mental health care. To ensure safety, staff perform this monitoring activity by observing an inmate through a window in the cell door. By observing an inmate through the window, a barrier is maintained between the staff member and the inmate that prevents the inmate from assaulting the staff member. To monitor the inmates at night, staff must have an artificial light source to enable them to observe the inmates and the interior of their cells.

Aside from incidental light from hallway sources, lighting within segregation cells during non-daylight hours comes from two sources. The lighting source for general illumination of the cell can be controlled by the inmate with a switch located in the cell. The other in-cell lighting source is one that is not controllable by the inmate. This light, referred to as a "nightlight," remains illuminated when the inmate shuts off the other in-cell light source. It remains illuminated at all times and cannot be shut off by the inmate. For security reasons, the nightlight is designed to remain illuminated in the event of a power outage by using the institution's self-contained power generation capacity.

The light fixture in each cell in the health and segregation complex is mounted high on one of the walls at the point where the wall and ceiling meet. Each fixture contains four fluorescent tubes. The nightlight is in the center of the light fixture and is illuminated at all times. The inmate control switch has four settings. The first position on the control illuminates a 32–watt fluorescent tube located in the center of the fixture. The second position illuminates two 32–watt florescent tubes located on each side of the center tube. The third position illuminates all three 32–watt tubes. The fourth position turns off all three 32–watt tubes but leaves the nightlight on. Since 1998, the nightlight has been a 9–watt fluorescent tube. The amount of illumination used is the minimum amount that sufficiently addresses security concerns and allows staff to observe inmates. The bulbs in the fixture

are covered by two lenses. One is a polycarbonate clear lens that is 1/4″ thick and the other is a 1/8″ acrylic prismatic lens that disperses the light and minimizes glare. Illumination levels may vary slightly from cell to cell because of the age of bulbs and the different brands in use.

Because the cells at the institution have narrow, opaque windows, little incidental light from the hallways reaches the interior of the cells. In addition, the institution's walls are covered with a satin finish paint that does not reflect light. As an alternative to continuous illumination from a source inside the cell, the correctional officer making the cell check could shine a flashlight into the cell through the cell window. However, a bright flashlight beam would be necessary to illuminate the inmate and the interior of the cell. Shining a bright light into a cell at unpredictable intervals would be more annoying to inmates and disruptive to their sleep than continuous low-level illumination. In addition, the flashlight alternative may increase conflict between inmates and staff because inmates may view the use of a flashlight as harassment. Staff would have discretion as to how long to shine the light into the cell. Use of the nightlights instead of light sources within staff control decreases the potential for conflict between inmates and staff. Further, some of the light from the flashlight would reflect back from the window, causing glare and making the inside of the cell less visible. Because the nightlight remains illuminated at all times, inmates are not alerted to its being turned on; this makes it more difficult for them to hide contraband in their cells. Inmates in the health and segregation complex are allowed to cover their eyes with a towel, washcloth or t-shirt while sleeping.

Defendant Steven Schueler has been employed by the Wisconsin Department of Corrections as a Program Captain at the Waupun Correctional Institution since 1999. In that capacity, defendant Schueler is responsible for the overall operation of the segregation unit, including the formation of policies applicable to inmates in the segregation unit. Defendant Schueler is not aware of any serious medical or mental health problems experienced by inmates in the health and segregation complex as a result of the lighting conditions. An inmate who complains of a medical problem caused by the nightlight may request and receive attention from the Health Services Unit. An inmate who complains of a mental health problem caused by the nightlight may request and receive attention from the Psychological Services Unit.

On June 9, 2003, plaintiff sent an interview/information request to Gary Ankarlo, the supervisor of the institution's Psychological Services Unit, in which he complained of stress resulting from the harsh conditions in the health and segregation complex, including the constant illumination. On June 26, 2003, plaintiff was seen by Dr. Betsy Luxford, a consulting psychiatrist for the Bureau of Health Services. Plaintiff complained to Dr. Luxford that the constant fluorescent lighting was hurting his eyes and that he was having trouble sleeping. Brenda Schrubbe, a registered nurse and the manager of the Health Services Unit at the Waupun Correctional Institution, assessed plaintiff, reviewed his file and concluded, to a reasonable degree of professional certainty, that plaintiff had not suffered serious medical consequences as a result of constant exposure to illumination in the health and segregation complex.

C. *Plaintiff's Mental Health Care at the Waupun Correctional Institution*

During his time at the Waupun Correctional Institution, plaintiff was seen by the Health Services Unit regularly for medical treatment. Records from the institution in-

dicate that defendant Fritz, who was employed as a correctional officer at the institution from June 9, 2003 to April 18, 2004, distributed medications in the health and segregation complex on June 30, 2003. Plaintiff was given a new prescription for Amitriptyline while at the institution. The medication had been prescribed for him to help him sleep when he was housed at the Wisconsin Secure Program Facility. Plaintiff's prescribed dose was 200 milligrams each night. He was supposed to receive a dose of Amitriptyline on June 30. While distributing medications that day, defendant Fritz discovered that he did not have any Amitriptyline to give to plaintiff. There was no Amitriptyline available at the institution that day.

Belinda Schrubbe, R.N., has been employed as the Manager of the Health Services Unit at the Waupun Correctional Institution since December 9, 2001. Prior to her employment in that capacity, Schrubbe served as a Nurse Clinician II at the institution from April 1996 to December 2001. According to Schrubbe, Amitriptyline manifests a certain amount of buildup in the human body. It can take up to 30 days to reach a therapeutic level in the human body. Missing one dose of the medication would not result in a decrease of that therapeutic level or cause the panic attack, cold sweats, tremors and nightmares described by plaintiff. Missing one dose of the medication would not cause serious health consequences. If plaintiff experienced the symptoms he described, it is unlikely that Health Services Unit staff would have treated him with any medication other than the Amitriptyline that was unavailable on that night. Plaintiff complained of similar symptoms while taking the drug as prescribed.

Staff in the Psychological Services Unit provide psychological services to offenders, make recommendations for institutional programming, assist in providing training to staff and participate with other Psychological Services Unit staff in structured case conferences. During his incarceration at the Waupun Correctional Institution, plaintiff was seen regularly by Psychological Services Unit staff for psychological treatment. Gary Ankarlo has been employed as the Psychologist Supervisor at the Waupun Correctional Institution since November 3, 2002 and is responsible for the overall administration of the institution's Psychological Services Unit. He has provided plaintiff with individual psychotherapy in addition to the psychological treatment plaintiff receives from other staff psychologists. At any given time, there are approximately 175 inmates housed in the health and segregation complex. Ankarlo personally treats five inmates individually on average; plaintiff was one such inmate. On the basis of his assessment of plaintiff and his review of plaintiff's clinical file, Ankarlo believes, to a reasonable degree of professional certainty, that plaintiff received proper mental health treatment while incarcerated at the institution and has not suffered serious psychological consequences as a result of exposure to constant illumination in the health and segregation complex.

## OPINION

### A. *Standard of Review*

To prevail on a motion for summary judgment, the moving party must show that even when all inferences are drawn in the light most favorable to the non-moving party, there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *McGann v. Northeast Illinois Regional Commuter Railroad Corp.*, 8 F.3d 1174, 1178 (7th Cir.1993). When the moving party succeeds in show-

ing the absence of a genuine issue as to any material fact, the opposing party cannot rest on the pleadings but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Lindemann v. Mobil Oil Corp.,* 141 F.3d 290, 294 (7th Cir.1998). If the nonmovant fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### B. *Telephone, Visitation and Publication Restrictions*

■ Plaintiff alleged that he lost access to the telephone after being transferred from the Secure Program Facility to the Waupun Correctional Institution. Also, he alleged that he was denied contact visits with family and friends and that he was denied publications that he had been allowed to possess at the Secure Program Facility. The framework for analyzing these restrictions is set out in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), in which the Supreme Court held that prison regulations that infringe an inmate's constitutional rights are valid if they are "reasonably related to legitimate penological interests." Courts consider four factors in determining whether a regulation meets this standard: (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether an inmate has alternative means of exercising the right in question; (3) the impact accommodation of the asserted right will have on the operation of the prison; and (4) whether there are alternatives to the regulation that show that it is an exaggerated response to prison concerns. *Lindell v. Frank,* 377 F.3d 655, 657 (7th Cir.2004) (citing *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254).

■ In this case, defendants have explained the justifications for their policies regarding telephone use, visitations and publications. They argue that the restrictions placed on these privileges are designed to promote the institution's interests in maintaining security and rehabilitating inmates by awarding increasing levels of privileges for good behavior. By not opposing defendants' motion, plaintiff has failed to meet his burden of introducing evidence from which an inference could be drawn that defendants could easily further their interests in security and rehabilitation with less restrictive means. *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (citations omitted) ("The burden ... is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."); *Turner,* 482 U.S. at 90–91, 107 S.Ct. 2254 (holding that it is inmate's burden to "point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests"). Accordingly, defendants' motion for summary judgment will be granted on these claims.

### C. *Eighth Amendment Claims*

#### 1. *Constant illumination*

■ Plaintiff alleged that his cell at Waupun was illuminated 24 hours a day and that he had trouble sleeping and suffered headaches, sore eyes and blurred vision. A condition of an inmate's confinement such as constant illumination violates the Eighth Amendment if it denies the inmate "the civilized measure of life's necessities," *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and is the result of deliberate indifference by prison officials. *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

■ The undisputed facts show that defendants are entitled to summary judgment on this claim. The only light in his cell that plaintiff does not have the power to turn off is a 9–watt fluorescent light that remains lit at all times to allow prison officials to observe inmates at night. To block out this minimal amount of light, inmates are allowed to cover their eyes with a towel, washcloth, or t-shirt while sleeping. Plaintiff did complain to Gary Ankarlo and Dr. Betsy Luxford about the constant illumination. However, Brenda Schrubbe, a registered nurse and the manager of the institution's Health Services Unit, assessed plaintiff, reviewed his file and concluded that the light in plaintiff's cell has not caused him any serious medical problems. Gary Ankarlo, the supervisor of the Psychological Services Unit, reached the same conclusion. The record is devoid of evidence tending to dispute the findings of these individuals. Therefore, plaintiff has not satisfied his burden to show that he suffered serious harm or was deprived of a basic human need. Moreover, even if plaintiff had made a colorable showing that the constant illumination subjected him to a substantial risk of serious harm, summary judgment would still be appropriate because he has not shown that any defendant was deliberately indifferent to this risk or that the adverse effects of the constant light outweigh the state's need to see inside the cells at all times to protect the safety and welfare of staff and inmates or that the state could meet that need in a less intrusive manner. *Cf. Bruscino v. Carlson*, 854 F.2d 162, 165 (7th Cir.1988) ("If order could be maintained in [United States Penitentiary in Marion, Illinois] without resort to the harsh methods attacked in this lawsuit, the plaintiffs would have a stronger argument that the methods were indeed cruel and unusual punishments."). Defendants motion for summary judgment will be granted as to this claim.

## 2. Inadequate Mental Health Care

In screening plaintiff's complaint, I noted that his allegations regarding the mental health treatment he received at Waupun were threadbare but sufficient to state a claim. I granted plaintiff leave to proceed on his claims that (1) he received inadequate treatment for his mental illness at Waupun; (2) he was denied a dose of a prescribed medication; and (3) he was denied treatment for the symptoms caused by the missed dose. The undisputed facts show that defendants are entitled to summary judgment on each of these claims.

■ An Eighth Amendment claim premised on inadequate medical care requires proof that an inmate faced a substantial risk of serious harm and that prison officials were deliberately indifferent to that risk. *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 926 (7th Cir.2004). To avoid summary judgment, plaintiff must present facts from which an inference can be drawn that he faced a substantial risk of serious harm and that prison officials were deliberately indifferent to that risk. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548 (summary judgment proper where party fails to make showing sufficient to establish existence of essential element on which party will bear burden of proof at trial).

■ Plaintiff's generalized allegation of inadequate mental health treatment is not sufficient to survive summary judgment in light of the facts defendants have provided regarding the mental health treatment plaintiff received. It is undisputed that plaintiff received regular medical and mental health treatment. In addition to the psychological treatment plaintiff received from Psychological Services Unit staff members, he received one-to-one psychotherapy from the unit's supervisor, Gary Ankarlo. On the basis of this evidence, no reasonable jury could conclude that the mental health treatment plaintiff received

at Waupun fell below the standards set by the Eighth Amendment.

■ With respect to plaintiff's claims that he was denied a dose of medication and treatment for the symptoms he experienced as a result of not receiving that dose, the facts indicate that plaintiff's prescription for a daily dose of Amitriptyline was renewed when he was transferred to Waupun but that on June 30, 2003, defendant Fritz, the officer in charge of distributing medications in the health and segregation complex, was unable to give plaintiff his prescribed daily dose because the institution had run out of Amitriptyline. Although plaintiff alleged that he suffered a panic attack, cold sweats, tremors and nightmares as a result, the undisputed facts, provided by Brenda Schrubbe, a registered nurse and manager of the institution's Health Services Unit, show that missing one dose of this drug would not cause a decrease in that therapeutic level. In addition, a single missed dose would not cause the symptoms described by plaintiff or any other serious health consequence. Finally, Schrubbe stated that if plaintiff experienced the symptoms he alleged, the proper treatment would have been a dose of the medication the institution lacked on June 30.

From these facts, it is clear that defendant Fritz's failure to give plaintiff his dose of Amitriptyline on June 30 did not constitute deliberate indifference to a serious medical need. The evidence indicates that more than one missed dose of the drug would be needed to alter its therapeutic effect and that a single missed dose would not cause the symptoms described by plaintiff in his complaint. Moreover, there is no evidence indicating that defendant Fritz's refusal to give plaintiff his medication was the product of deliberate indifference. To the contrary, plaintiff did not receive his medication because the institution did not have any to give him.

Finally, the evidence could not reasonably support a finding that the symptoms plaintiff allegedly experienced constituted a serious medical need. There is no evidence that the panic attack, cold sweats, tremors and nightmares placed plaintiff's health in jeopardy or caused him permanent harm. The very nature of these symptoms suggests that they were temporary. Beyond that, an isolated incident of neglect, when juxtaposed against the facts indicating that plaintiff received adequate mental health treatment at Waupun, is insufficient to support a finding of deliberate indifference. *Gutierrez v. Peters,* 111 F.3d 1364, 1375 (7th Cir.1997). Therefore, defendants are entitled to summary judgment as to plaintiff's claims of inadequate mental health care.

## ORDER

IT IS ORDERED that defendants' motion for summary judgment as to all of plaintiff Kurtis King's claims in this case is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.