**Jerrod ANDERS, by his next friend and father, Stephen ANDERS, on his own behalf and on behalf of those similarly situated, Plaintiff,**

v.

**FORT WAYNE COMMUNITY SCHOOLS, Defendant.**

**No. 1:00CV0096CAN.**

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 14, 2000.

Jacquelyn E. Bowie, Elizabeth P. Freitag, Indiana Civil Liberties Union, Indianapolis, IN, for plaintiffs.

William L Sweet, Jr., Craig R Patterson, Martha M. Kinder, Matthew J. Elliott, Beckman Lawson Sandler Snyder and Federoff, Fort Wayne, IN, for defendant.

## MEMORANDUM & ORDER

NUECHTERLEIN, United States Magistrate Judge.

Jerrod Anders, a 16 year old Northrop High School student, brings this suit by his next friend and his father Stephen Anders, seeking compensatory damages, declaratory relief, and to enjoin the defendant, the Fort Wayne Community Schools, from authorizing the search of student vehicles where there is no reasonable suspicion, or consent for the search. There are two distinct parts to the Complaint: Mr. Anders asks this court to determine whether the October 19, 1999, search of Anders' vehicle was consistent with the mandates of the Fourth Amendment, and to judge the constitutional propriety of the defendant's implied consent policy. The matter is currently before the court on defendant's Motion for Summary Judgment and plaintiff's Cross Motion for Partial Summary Judgment, both of which

were filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. Relevant Facts & Procedure

On October 19, 1999, Jerrod Anders was a sophomore at Northrop High School in Fort Wayne, Indiana. (*Complaint*, ¶ 11). On that day, he asserts that he left the school building during his lunch period, to go to his car to look for an art project. (*Anders Deposition*, at 18–19, 29–30). Northrop High School has written rules requiring a student to have a pass before going to his or her vehicle during the school day (*Selvia Deposition* at 15); Anders had no pass. (*Id.* at 20). Consequently, following a series of events starting with Anders being observed in the parking lot by a school security officer, his car was searched giving rise to the lawsuit which he ultimately filed on March 6, 2000. Anders challenges the October 19, 1999, search of his car, and also challenges the Fort Wayne Community Schools' implied consent policy, which he alleges was implicated by the October 19, 1999, search.

During the 1999–2000 school year, Jerrod Anders had applied for a Parking Permit as required of all students wishing to drive to school. (*Complaint*, ¶ 13). One was issued to Anders. (*Id.*). The terms of the Fort Wayne Community Schools Student Rights and Responsibilities & Behavior Code, bound him to the terms of the implied consent policy which he now challenges. (*Id.* ¶ 29). The relevant code section states as follows:

> "Authorized school personnel may conduct a search of a student, locker, book bag, student possessions/belongings, or automobile if they have reasonable suspicion for a search. A student who requests parking privileges gives implied consent for a search."

(*1999–2000 Fort Wayne Community Schools Student Rights and Responsibilities & Behavior Code*, pg. 3). Anders' Complaint alleges that both the policy and the search at issue were unconstitutional violations of the Fourth and Fourteenth Amendments to the United States Consti-

tution, and an unconstitutional violation of Article 1 § 11 of the Indiana Constitution.

The defendant school corporation has responded to Anders' Complaint by arguing that the policy being challenged by plaintiff is irrelevant to this case. Defendant maintains that although the implied consent policy was in effect at the time of Anders' search, it was never relied upon to justify the search of his car. Instead, defendant contends, Anders' vehicle search was justified by a reasonable suspicion created by Anders' conduct in combination with activities that had been taking place in the Northrop High School parking lot over the weeks leading up to the search.

Approximately a week to a week and a half prior to the challenged search, numerous complaints were lodged by Northrop High School staff concerning students smoking in the school parking lot. (*Selvia Deposition*, pg. 14). The assistant principal recognized a problem, notified security, and asked that security address the issue. (*Id.*). They did, and several students were caught smoking in the parking lot during the week leading up to the search challenged by Anders' Complaint. (*Id.*).

At the time the challenged search took place Officer Timothy Selvia was a nine-year veteran of the Fort Wayne Police Department, and had worked as part time school security guard for eight years. (*Selvia Deposition*, pg. 5). On October 19, 1999, Selvia was working in the Northrop High School parking lot. (*Id.* at 14). He positioned himself between cars in the lot so he could see students who exited the building over the lunch period. (*Id.*). After about thirty-five minutes at that location Selvia spotted Jerrod Anders walking briskly through the lot toward the school entrance. (*Id.* at. 16). Selvia had not seen Anders exit the building, and therefore assumed that he had been outside for some time. (*Id.* at 19). Selvia shouted at Anders a few times, but failed to get his attention, so he followed Anders into the school building. (*Id.* at 18). When ques-

tioned by Selvia inside the school building, Anders admitted he did not have a pass to be outside; he told Selvia that he had gone to his car to retrieve an art project that he thought was in the car, but as it turned out it was not there. (*Id.* at 20). At that point Selvia became suspicious that Anders had violated several regulations, and asked Anders to go with him back to his vehicle. (*Id.* at 23–25).

As stated by the plaintiff, Officer Selvia's reasons for searching Jerrod's car were the reasons he gave in his sworn deposition testimony. In responding to questions during deposition, Officer Selvia described his suspicion in detail, and he explained the particular regulations he thought Anders had violated at the time the search was initiated:

A.  He says that he was going to get an art project that he does not have, there is no art project, he did not have permission to go out and get the art project in the first place; that coupled with the fact that we were having the problems with the kids out in their cars smoking and just by previous experience of dealing with kids when they've been out in their cars during a school day when they weren't supposed to be out there was an indication to me from experience that he was probably out doing something in the car he wasn't supposed to be doing. And so that's why we were going back out to see, at that point, if he had contraband of some sort or another in his car.

Q.  Okay. So you thought you wanted to go out to the car because you thought he might have contraband, is that the reason?

A.  We're going to go find out what he was doing out in his car, you know, what were we doing out in the car. And at that point in time, the suspicion probably was that we were out smoking in our car.

\*     \*     \*     \*     \*     \*

Q.  Okay. Did you think that he violated a specific rule?

A.  Well, yeah, he did violate a specific rule.

Q.  Which?

A.  He went out to the parking lot and got in his car without a pass.

Q.  Other than that rule, did you think that he had violated any other rule?

A.  Possibly skipping class as well, at that point.

Q.  Okay. Okay, I mean in relation to you said you wanted to take him out to the car because you thought he might have violated some rule, and I'm asking if there's a specific rule that you thought he had violated at that point?

A.  Well, like I said, from all the dealings I've had with kids out in their car, there could have been several violations, okay. And at that point in time was there one particular one in mind? Smoking may have been more than maybe some other ones.

(*Selvia Deposition*, at 22–24).

As indicated by his testimony, smoking was among the violations suspected by Selvia prior to the search of Anders' vehicle. And the suspicions were apparently correct. The resulting search of the car turned up an open pack of cigarettes, two lighters, and two pocket knives. (*Selvia Deposition*, pg. 27 & 29). Anders was thereafter given a citation for the tobacco violation, (*Selvia Deposition*, pg. 31) and expelled from school. (*Complaint*, ¶ 34). The expulsion was later modified to allow Anders to attend school on a probationary basis. (*Id.*).

## II. Summary Judgment Standard

"It is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained." *Mason v. Continental Illinois Nat. Bank*, 704 F.2d 361, 367 (7th Cir.1983). Thus, the Supreme Court has made it clear that summary judgement is not a disfavored procedural

shortcut, but it is rather an integral part of the federal rules as a whole, which are designed to secure the speedy and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Initially, under Rule 56(c), a party seeking summary judgment bears the responsibility of informing the court of the basis for the motion, and identifying evidence which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Once a properly supported motion for summary judgment is made, the party that bears the burden of proof on a particular issue at trial cannot resist the motion by merely resting on its pleadings. *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994). As Fed.R.Civ.P. 56(e) makes clear, to survive summary judgement the adverse party's response, "by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994); *Cleveland v. Porca Co.,* 38 F.3d 289, 295 (7th Cir.1994); *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir.1994); *Roger v. Yellow Freight Systems,* 21 F.3d 146, 148–49 (7th Cir.1994). The bottom line is that a summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as

a matter of law." *Id.* at 251–252, 106 S.Ct. 2505.

## III. Analysis

### A. The Search—Reasonable Suspicion

In 1985 the Supreme Court established the standard for determining the propriety of the search of student property by school officials in a case called *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).[1] There, the court found that the Fourth Amendment prohibition on unreasonable searches and seizures does apply to searches conducted by public school officials, although it also found that the school setting demands some easing of the restrictions to which searches by public authorities are ordinarily subject. *Id.* at 334, 341, 105 S.Ct. 733. The court described the applicable standard as follows:

> "... the legality of a search of a student should depend simply on the reasonableness, under all circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the action was justified at its inception, second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student violated or is violating either the law or the rules of the school."

*Id.* at 341–342, 105 S.Ct. 733 (internal citations omitted).

◼ Since the *T.L.O.* decision, the Seventh Circuit has interpreted the standard, and attempted to clarify its meaning.

---

**1.** Indiana also adopted the rule as set forth in *T.L.O.* for its analysis under Article I, Section II of the Indiana Constitution in *Berry v. State,* 561 N.E.2d 832 (Ind.Ct.App.1990). Accordingly, an analysis of the issues raised by this case under the rule of *T.L.O.* is applicable in determining the propriety of the matter in connection with both the state and federal constitutional claims raised by the plaintiff.

In doing so the circuit court has explained that the "justified at its inception portion" of the opinion means that "a search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation." *Bridgman v. New Trier High School Dist. No. 203*, 128 F.3d 1146, 1149 (7th Cir.1997) (citing *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993)). It is under this portion of the *T.L.O.* rule that Anders first focuses his arguments against the defendant's search. The court finds the arguments to be unpersuasive, finding instead that the facts of the instant case demonstrate conduct supporting the reasonable suspicion required by the Constitution.

For more than a week prior to the search at issue in this case, Northrop High School staff had complained that students were smoking in the school parking lot during the lunch period. School officials exercised their professional judgment and determined that smoking was a problem [2]; they asked school security to address the problem. Thereafter, numerous students were caught by security violating the prohibition against smoking. It was against this backdrop of ongoing smoking violations that Officer Selvia became suspicious that Jerrod Anders had also been smoking in the school parking lot.

Anders was observed in the parking lot on October 19, 1999, during the school lunch period and he admitted that he left the building without a pass in violation of school regulations. Security Officer Selvia spotted Anders. Based upon Selvia's years of experience as a police officer and a school security officer, Selvia concluded that Anders' actions indicated he was probably "doing something in the car he wasn't supposed to be doing." And con-

trary to the arguments of the plaintiff, Officer Selvia's deposition indicates that the "something" suspected included the suspicion that Anders was violating specific school rules.

The officer listed several suspected violations. The violations included that Anders had been in the parking lot without a pass, that he had been skipping class, and again referring repeatedly of ongoing complaints and problems regarding smoking in the school parking lot, Officer Selvia also indicated that he suspected Anders had been out in his car smoking.

Although plaintiff argues that Officer Selvia never claimed to have had a reasonable suspicion that Jerrod Anders was smoking prior to the search of his vehicle, the court finds that the evidence indicates otherwise. Officer Selvia did not phrase his suspicion during deposition in the precise language preferred by the court or preferred by those in the legal profession. But Officer Selvia is not a lawyer. Nevertheless, his deposition testimony taken as a whole, and not in the piecemeal fashion offered, clearly expresses that one of his primary suspicions, prior to the search of Anders' vehicle, was that Anders had been in the car smoking.

This case is not unlike *Bridgman v. New Trier High School Dist. No. 203*, 128 F.3d 1146 (7th Cir.1997). In *Bridgman*, a school official observed the plaintiff/student giggling and acting unruly during class. *Id.* at 1147. The school official in that case noted that the student's eyes were bloodshot and his pupils dilated. *Id.* Based upon her observations in combination with her knowledge and expertise, the school official thought the symptoms indicated that the student was using marijuana. *Id.* at 1149. Consequently, he was taken to the nurse's office, given a medical assessment, and then asked to remove his outer garments and empty his pockets.

**2.** This is not surprising considering the fact that statistics kept by the Centers for Disease Control and Prevention have demonstrated that teen smoking has jumped by 73% during

the period between 1988 and 1996. Tamerlin Drummond, *Busted for Possession: Florida Tries to Snuff Out Teen Smoking by Taking Kids to Court*, Time, Dec. 7, 1998.

*Id.* at 1148. The search was challenged and upheld by the Seventh Circuit. In upholding the propriety of the search, the circuit court agreed that the appropriate inquiry in determining the reasonableness of a search is not whether the student's conduct unambiguously indicates the suspected violation; but rather, the inquiry is whether the school official's suspicion of a violation is reasonable. *Id.* at 1149.

Here, Officer Selvia observed Anders involved in conduct which was analogous to the bloodshot eyes observed in *Bridgman;* he observed Anders in the school parking lot without a pass, in a location frequented by student smokers. Also, like the school official in *Bridgman,* Selvia testified that he applied his own knowledge and expertise and concluded that Anders' conduct raised suspicions that he was violating school regulations—most likely the particular regulation prohibiting smoking on school property. Anders' conduct may not have universally been viewed as an indication that he had been smoking, but such a suspicion was not unreasonable under the circumstances of this case. The standard of reasonableness used to evaluate the propriety of the search of a student vehicle should be judged under all the circumstances. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. 733. Here, those circumstances were more than sufficient to support the reasonable suspicion articulated by Officer Selvia during his deposition and more than sufficient to support the reasonableness mandated by the Constitution.

Anders citation to *Cales v. Howell Public Schools,* 635 F.Supp. 454 (E.D.Mich. 1985) fails to persuade the court otherwise. Anders cites the case in arguing that the search of his vehicle failed to meet the "justified at its inception" requirement of *T.L.O.* In *Cales,* a 15–year–old tenth grade student was seen attempting to avoid detection in the school parking lot by "ducking" behind a parked car when she was supposed to be in class. When confronted by the school security guard she gave a false name. The student was thereafter escorted to the school office where she was required to empty the contents of her purse. Her purse contained "readmittance slips" which were improperly in her possession. She was then instructed to turn her jean pockets inside-out, completely remove her jeans and was required to bend over so defendant could visually examine the contents of her brassiere. The *Cales* defendant described the basis for the search in that case as the belief that the student was in possession of illegal drugs. *Id.* at 455. In reviewing the constitutional propriety of the defendant's actions, the District Court found nothing in the student's conduct that could reasonably support the suspicion articulated by school officials:

> "It is clear that plaintiff's conduct created reasonable grounds for suspecting that some school rule or law had been violated. However, it does not create a reasonable suspicion that a search would turn up evidence of drug usage. Plaintiff's conduct was clearly ambiguous. It could have indicated that she was truant, or that she was stealing hubcaps or that she had left class to meet a boyfriend ... This Court does not read *T.L.O.* so broadly as to allow a school administrator the right to search a student because that student acts in such a way so as to create a reasonable suspicion that the student has violated some rule or law. Rather, the burden is on the administrator to establish that the student's conduct is such that it creates a reasonable suspicion that a specific rule or law has been violated and that a search could reasonably be expected to produce evidence of that violation."

*Id.* at 457.

While the court finds the reasoning of *Cales* to be sound, it also finds the facts distinguishable from the instant case, and consequently, the case law is inapplicable here. First, unlike the plaintiff in *Cales,* Jerrod Anders was never asked to remove his clothing. His challenge addresses only the constitutional propriety of the search

of his vehicle.[3] The Supreme Court's decision in *T.L.O.* makes it clear that the reasonableness of a search is related, in part, to the severity of the intrusion into the individual's privacy interests. *See T.L.O.*, 469 U.S. at 341–342, 105 S.Ct. 733. Thus, what does not constitute "reasonable suspicion" to justify one search in one particular case may suffice to justify a search where that search is less intrusive or less demeaning to the student subjected to the search. *United States v. Smith*, 557 F.2d 1206, 1209 n. 6 (5th Cir.1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978). Stated differently, "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness." *Cornfield*, 991 F.2d. at 1321. The intrusion suffered by Jerrod Anders was clearly less intrusive and less demeaning than that suffered by the *Cales* plaintiff. The difference between *Cales* and the instant case is very relevant to the analysis. As a result of the distinct differences in this and the *Cales* case, the reasonableness analysis applied in *Cales* is inapplicable to the Jerrod Anders' search as it is challenged here.

Second, even if the *Cales* analysis were applicable, it would not produce the same result because there are far more facts here supporting the reasonable suspicion that justified the search at issue. A police officers' experience, and knowledge of behaviors indicating particular violations are all relevant to the totality of circumstances supporting reasonable suspicion. *U.S. v. McCarthur*, 6 F.3d 1270, 1277–78 (7th Cir. 1993). Such knowledge and experience are cited here to demonstrate the reasonable suspicion supporting the challenged search, while they are not cited in *Cales*. Moreover, the totality of circumstances supporting reasonable suspicion also properly includes the fact that the person searched was in an area known for a high incidence of the suspected violation. *See*

*U.S. v. Quinn*, 83 F.3d 917, 921 n. 2 (7th Cir.1996); *U.S. v. Evans*, 994 F.2d 317, 322 (7th Cir.1993). Defendants here note that the parking lot where Anders was spotted was the location of several smoking violations contemporaneous to the challenged search, lending further support to the reasonable suspicion articulated by the defendants in support of the search that occurred. In *Cales*, however, no similar facts supporting the reasonableness of the search were so much as mentioned.

Quite clearly, in *Cales*, there were no circumstances other than the plaintiff's "ambiguous" behavior that supported school officials' suspicion that the *Cales* plaintiff was using or in possession of drugs. There, school officials attempted to justify an extremely invasive strip search for drugs on two grounds: (1) the student was attempting to avoid detection in the school parking lot by "ducking" behind cars; and (2) she gave a false name when she was caught. By contrast, Officer Selvia acting on behalf of the Fort Wayne Community Schools, had much more to justify the search of Jerrod Anders' vehicle. The facts supporting Selvia's search included: (1) that Anders was in the school parking lot during school hours without a pass; (2) that just prior to the search there had been numerous complaints of students frequenting the parking lot smoking; (3) that several students had been caught in the parking lot smoking over the week leading up to the challenged search; (4) the length of time Anders was suspected to have been in the lot raised suspicion; (5) Anders' claim that he had gone to the car for an art project, yet there no such project visibly on his possession when he was spotted and confronted by Officer Selvia; and last (6) Officer Selvia's experience with students who did not have permission to be in the parking lot gave rise to suspected violations. Each of the factors that aroused Selvia's suspicion had a nexus

---

**3.** Upon finding knives and cigarettes in Anders' vehicle Anders was given a pat-down and the contents of his wallet were inspected. This part of the search, however, is unchallenged by the Complaint, and is therefore not addressed in this opinion.

with Anders' vehicle, leading the court to conclude that unlike the strip search at issue in *Cales,* the search of Anders' vehicle in this case was appropriate.

Next Anders argues that if the court finds that his search was justified at its inception it must find against the defendants by concluding that the search was not reasonably related in scope to the circumstances justifying any inference of a violation in the first place. More specifically, Anders contends that the school security officer should have asked more questions instead of searching his car. The court can not agree.

The lower standard devised by the Supreme Court for the evaluation of searches of student property by school officials was established in part to "spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense." *T.L.O.,* 469 U.S. at 343, 105 S.Ct. 733. School officials at Northrop High School, generally, and Officer Timothy Selvia, in particular, used reason and common sense and recognized that smoking in the parking lot was a problem at their school; they used that same reason and common sense to address the problem. Most important, this court also finds that Officer Selvia applied that same reason and common sense in forming a suspicion that Jerrod Anders was smoking on October 19, 1999, and in his decision to search Anders' vehicle to discover if there was evidence of that violation.

In *T.L.O.* the Supreme Court determined that the search of a student's purse was reasonably related to her being suspected of smoking in the school bathroom. Similarly in this case, this court finds that the search of Jerrod Anders' car was reasonably related to the suspicion that he had been in the car smoking which is violation of established school policy.

Our courts have frequently cautioned the judiciary against interfering with the judgment of professionals in disciplines outside of the educational arena. *See Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987) (The court does "not sit as a super-personnel department that reexamines an entity's business decisions."). While a school is not a prison nor a personnel office, this court finds that school professionals are equally entitled to the respect given by our courts to other professionals. The reasonableness inquiry applicable to the evaluation of a school search "cannot disregard the schools' custodial and tutelary responsibility." *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). It is not the place of the court to interfere with the attempt of school officials to carry out those responsibilities by demanding, as the plaintiff suggests, that school officials ask more questions before they carry out a search that they deem reasonable and necessary to fulfil their obligations. More important, there is no constitutional basis for that kind of interference here. The Supreme Court recognized in *T.L.O.* that maintaining order in the school setting has never been easy. *T.L.O.,* 469 U.S. at 339, 105 S.Ct. 733. This court will not make that job more difficult by questioning a search that is clearly reasonable under the circumstances.

### B. The Policy—Implied Consent

■ Because the court finds that the search at issue was constitutional without reaching the propriety of the defendant's implied consent policy, it is necessary to determine whether the policy challenge raised by the plaintiff presents a case or controversy within the meaning of Article

III of the U.S. Constitution before it can turn to the substance of the policy challenge alleged. Article III of the Constitution limits the judicial authority of the federal courts to cases and controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Standing and ripeness are two justiciability doctrines developed by our courts to determine whether case or controversy exists in the manner necessary to support federal jurisdiction, and also to evaluate the wisdom of deciding an issue posed by a particular claim. *The Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3rd Cir.1994). The requirement that a plaintiff have standing and that his claim be ripe for judicial review are a means of limiting the role our courts play in our democratic society. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); 13 *Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction* 2d § 3531.1. Consistent with the limiting role, there is a presumption that a federal court lacks jurisdiction "unless 'the contrary appears affirmatively from the record.'" *Renne v. Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (quoting *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 546, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)).

The phrase "cases and controversies" in Article III of the Constitution imposes an injury-in-fact requirement on a plaintiff who presents a claim in federal court. And, in measuring whether the litigant has asserted an injury that is real and concrete, the concepts of ripeness and standing merge almost completely, because each of the two doctrine requires some showing of an injury. *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1139 (9th Cir.2000) (citing Gene R. Nichol, Jr., *Ripe-*

*ness and the Constitution*, 54 U.Chi.L.Rev. 153, 172 (1987)).

Injury-in-fact is one of three elements a plaintiff must show to demonstrate the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. The elements necessary to show standing include that (1) the plaintiff suffered an injury-in-fact: an invasion of a legally protected interest which is (a) particularized and concrete, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the complained of injury and the challenged action; and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. at 560–561, 112 S.Ct. 2130 (internal citations omitted).

The injury element is the element that is most problematic to finding that Anders' has standing to raise his policy challenge in this case. A complainant has the responsibility "to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary*, 501 U.S. at 316, 111 S.Ct. 2331. Yet, toward that end, the only injury-in-fact Anders alleges is that "he must either rescind his request for parking privileges and forego driving to and parking at school, or else face the application of the school's unconstitutional implied consent policy." *Plaintiffs' Memorandum in Reply to Defendants Motion for Summary Judgment and in Support of Plaintiffs' Cross Motion for Partial Summary Judgment*, pgs. 10–11.

Despite Anders' claims, however, there is no evidence that the implied consent policy was applied to the search of Anders's vehicle [4], nor are there facts alleged

---

4. Plaintiff points to a letter written by Assistant School Superintendent Douglas Coutts as evidence that the implied consent policy was implicated here. The court has reviewed that letter and concludes otherwise. In the letter, apparently responding to concerns expressed by Anders' parents, Coutts makes mention of the implied consent policy. Nevertheless, in that same letter Coutts expressly states that the search of Jerrod's car was justified by the

supporting the conclusion that random searches have ever been or will ever be performed pursuant to the challenged policy. The case presents a pre-enforcement challenge. Anders is correct in pointing out that the pre-enforcement nature of a challenge does not eliminate standing. But considering the elements necessary to establish standing, the pre-enforcement nature makes a showing of standing more difficult.

■ To justify pre-enforcement relief a plaintiff still has to show actual present harm or a significant possibility of future harm. *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 527 (6th Cir.1998) (citing *National Rifle Ass'n of America v. Magaw,* 132 F.3d 272, 279 (6th Cir.1997)); *Bras v. California Public Utilities Com'n,* 59 F.3d 869, 873 (9th Cir. 1995), *cert. denied,* 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996). Persons having no concrete fears that a policy or statute will be applied against them, except for those fears that are imaginary or speculative, are not accepted as appropriate plaintiffs. *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). The Supreme Court has called the area where injury is no more than speculation and conjecture an area beyond the bounds of the court's jurisdiction. *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). In *Whitmore* the Supreme Court reviewed a long list of cases where it failed to find an injury adequate to support standing based upon the future application of an allegedly illegal policy:

> "We have ... thought inadequate allegations of future injury contingent on a plaintiff having an encounter with police wherein police would administer an allegedly illegal 'chokehol[d],' *Los Angeles*

*v. Lyons,* 461 U.S., at 105, 103 S.Ct. 1660, on the prospective future candidacy of a former Congressman, *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), and on police using deadly force against a person fleeing from an as yet unaffected arrest. *Ashcroft v. Mattis,* 431 U.S. 171, 172, n. 2, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). Recently in *Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), we rejected a physician's attempt to defend a state law restricting abortions, because his complaint that fewer abortions would lead to more paying patients was ' "unadorned speculation' " insufficient to invoke the federal judicial power. *Id.,* at 66, 106 S.Ct. 1697 (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S., at 44, 96 S.Ct. 1917.) Each of these cases demonstrates what we have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact."

*Whitmore,* 495 U.S. at 158, 110 S.Ct. 1717.

Similar to the cases cited above, Jerrod Anders' alleged injury in this case is based upon the possibility that the challenged policy may be applied in the future, subjecting him to an alleged illegal violation of his Fourth Amendment right. But fears that the defendant's implied consent policy may be applied against Anders can only fall into the category of imaginative or speculative harm because he presents no evidence indicating that the application of the challenged policy is anything more. The fact that the policy is on the books is simply not enough to satisfy the requirements of Article III.

The plaintiff makes a correct statement of the law in noting that there can be standing to challenge a policy that is currently in effect and capable of being ap-

---

reasonable suspicion created by Jerrod's act of going to his vehicle. The reasonable suspi-

cion referred to makes reliance on the policy unnecessary for the action taken.

plied, even if it has not been applied in the past. See, e.g., *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Hays v. City of Urbana, Ill.*, 104 F.3d 102 (7th Cir.1997); *Brownsburg Area Patrons Affecting Change v. Baldwin*, 943 F.Supp. 975 (S.D.Ind.1996). But the suggestion that the mere existence of a policy is sufficient to show actual injury for the purpose of demonstrating standing is in error. Although our courts do not always require a plaintiff to await arrest or prosecution before entertaining a challenge to the constitutionality of a statute or policy, See *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301, a showing of injury-in fact requires that "a plaintiff who challenges a stature must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* This rule of law is stressed by the courts in each of the cases plaintiff has cited.

*Babbitt* involved a challenge of the Arizona Agriculture Employment Relations Act filed by farm workers and union representatives. *Babbitt*, 442 U.S. at 292, 99 S.Ct. 2301. Among other things the Act proscribed various union practices and established a civil and criminal enforcement scheme to ensure compliance. *Id.* at 293, 99 S.Ct. 2301. Although the Supreme Court in *Babbitt* found that there were justiciable pre-enforcement issues, it did not reach the conclusion by the mere fact that a law was on the books and enforceable. Instead, the Supreme Court in *Babbitt* reiterated that a plaintiff making a pre-enforcement challenge to a government statute or policy *must* demonstrate "a realistic" and "credible" danger of injury resulting of the challenged policy's operation or its enforcement. *Id.* at 298, 99 S.Ct. 2301 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (emphasis added)). The court found the plaintiffs had demonstrated such a harm in *Babbitt* by showing that the challenged act imposed a continuing burden on their associational rights. *Id.* at 300, 99 S.Ct. 2301. But it was only by finding the

statute burdened the plaintiffs' constitutional rights that the court conclude that the plaintiffs had standing to support federal jurisdiction to litigate their challenge. *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301.

Courts have long held that arrest, prosecution, and conviction are tangible harms, and so is abandoning one's constitutional rights, particularly those rights protected under the First Amendment. *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir.1995). Similar to *Babbitt*, the court in *Brownsburg* found plaintiff had suffered a constitutional injury. In *Brownsburg*, concern over the chilling effect of the challenged statute on plaintiff's First Amendment rights demonstrated harm which in turn accorded the plaintiff standing necessary to support the court's jurisdiction to hear the matter. *Brownsburg*, 943 F.Supp. at 983.

Mr. Anders has alleged no abandonment of a First Amendment right, he claims no burden on his right to free association nor has he alleged any other tangible harm that would support standing. To repeat for emphasis the only harm Anders has alleged is that he may have to give up parking at school or be subjected to possible search in violation of the Fourth Amendment.

In *Hays*, also cited by the plaintiff, the Seventh Circuit concluded that plaintiffs had no standing because they had failed to demonstrate that there was any real threat that the challenged law would be applied against them. *Hays*, 104 F.3d at 104. In other words, the mere fact that a law was on the books and could be applied against the plaintiffs was not enough to support standing. Like the plaintiff in *Hays*, Anders has not shown that he is under any real threat of being subjected to the challenged policy. Anders never contends that he has given up driving as the result of the policy. He never contends that he has been threatened with the application of the consent to search policy if he does not give up driving. Moreover, there is no evi-

dence to suggest that the policy ever has been or will be enforced against him. Anders' policy challenge seeks declaratory and injunctive relief. Time and time again our courts have stated that a person must allege a substantial likelihood that he will in the future be subjected to an allegedly illegal policy in order to have standing to seek an such relief. *Smith v. Wisconsin Dept. of Agriculture, Trade, and Consumer Protection,* 23 F.3d 1134, 1141 (7th Cir. 1994) (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Contrary to Anders' arguments, the application of the policy he challenges and any harm resulting from the existence of the policy is mere speculation and conjecture. Accordingly, he has failed to make a showing sufficient to demonstrate standing to challenge the defendant's implied consent policy, which in turn deprives the court of the jurisdiction necessary to decide the policy challenge raised.

■ "The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Com'n,* 220 F.3d at 1138. Consequently, reviewing the ripeness of plaintiff's claim adds further support to the conclusion that the facial policy challenge raised in Anders' Complaint is lacking in justiciability.

Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or occur at all. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Com'n,* 461 U.S. 190, 200–01, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). The doctrine of ripeness is closely related to standing in cases involving a pre-enforcement challenge; the two concepts often collapse into one issue. *Smith v. Wisconsin Dept. of Agriculture,* 23 F.3d at 1141. The basic "rationale of the ripeness doctrine 'is to prevent the courts, through premature adjudication from entangling themselves in abstract

disagreements.'" *National Rifle Ass'n of America v. Magaw,* 132 F.3d 272, 284 (6th Cir.1997) (citing *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). It is a question of timing. "There are situations where, even though an allegedly injurious event is certain to occur, the Court may delay resolution of constitutional questions until a time closer to the actual occurrence of the disputed event, when a better factual record might be available." *Blanchette v. Connecticut General Ins. Corporations,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Public Affairs Associates, Inc. v. Rickover,* 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). Stated another way, a case is not ripe if further factual development is required. *New Orleans Public Service, Inc. v. Council of New Orleans,* 833 F.2d 583, 587 (5th Cir.1987).

A factual record is of particular significance here. In the past, the Seventh Circuit has observed that it is difficult to judge the constitutional propriety of an implied consent policy in a factual vacuum. *McGann v. Northeast Illinois Regional Commuter R.R. Corp.,* 8 F.3d 1174, 1180 (7th Cir.1993). And facts are even more important when raised in the context of the Fourth Amendment; courts have long emphasized that the "touchstone of the Fourth Amendment is reasonableness," which is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Because there is no evidence that defendants relied on the challenged implied consent policy in this case, nor is there evidence that they have ever enforced the policy in the past, or that they intend to in the future, there are no facts upon which to determine the propriety of the policy at this time and any determination would have to be done in the factual vacuum warned against in *McGann.*

In *McGann,* the court listed several factors for consideration in determining the

propriety of a warrantless search sanctioned by implied consent. The court instructed as follows:

"Generally, in deciding whether to uphold a warrantless search on the basis of implied consent, courts consider whether (1) the person searched was on notice that undertaking certain conduct, like attempting to enter a building or board an airplane, would subject him to search, (2) the person voluntarily engaged in the specified conduct, (3) the search was justified by a 'vital interest', (4) the search was reasonably effective in securing the interests at stake, (5) the search was only as intrusive as necessary to further the interests justifying the search, and (6) the search curtailed, to some extent, unbridled discretion in the searching officers ... these factors should be examined carefully in each case in evaluating the totality of the circumstances ..."

*McGann* at 1181.

The facts and circumstances necessary to conduct such a review are plainly lacking in this case. Thus, more facts must be developed before the policy challenge levied by Jerrod Anders is ripe for the court's ruling. Accordingly, because the plaintiff lacks standing, and the issue is not ripe for adjudication at this point in time, the court is lacking the jurisdiction necessary to address the policy challenge raised in plaintiff's Complaint and the claim must be dismissed, and judgement entered in favor of the defendant.

### Conclusion

For the foregoing reasons, the court **GRANTS** the defendant's Motion for Summary Judgment [Dkt. No. 36], and it **DENIES** the motion for Partial Summary Judgement [Dkt. No. 38] filed by the plaintiff.

**SO ORDERED.**